## HANSEN v. ABRAHAM IRR. CO.

No. 5130.   Decided September 20, 1933.   (25 P. [2d.] 76.)

*Morris & Callister* and *J. K. Smith,* all of Salt Lake City, for appellant.

*Irvine, Skeen & Thurman,* of Salt Lake City, for respondent.

STRAUP, Chief Justice.

This action was brought by Hansen, a resident of Mt. Pleasant, Sanpete county, against the company on two counts one to recover $7,000 paid by him for 200 shares of the capital stock of the company alleged to have been sold to him by the company without a permit or license in violation of the provisions of chapter 111, Laws of Utah 1919, known as the "Blue Sky Law," which, as alleged, rendered the sale void, and entitled the plaintiff to recover back the purchase price paid; the other, to recover *it* back on alleged grounds of fraud and misrepresentations.

The defendant by its answer denied that the stock was purchased from it or from any one authorized by it to sell shares of stock for or on its behalf or that it sold shares of any stock to the plaintiff or to any one, and hence denied that it violated any of the provisions of the Blue Sky Law, and further denied it was liable or responsible for whatever fraudulent representations may have been made by those from whom the plaintiff purchased the shares of stock in question. The defendant, while not directly, yet indirectly denied even its alleged corporate existence or capacity, or that those shown by its corpoarte records to be its officers were in fact its officers or agents. The case was tried to the court and a jury. At the conclusion of the plaintiff's

evidence, the court, on motion of the defendant, based on the ground that the evidence was insufficient to show that the shares of stock in question were purchased from the defendant or from any one authorized by it to sell shares of stock for or on its behalf or that the shares of stock sold to the plaintiff were owned by the company, but were owned by W. D. Livingston individually, who was the secretary of the company, granted a nonsuit and dismissed the action, from which judgment the plaintiff appeals. The chief assignment relates to the ruling granting the nonsuit.

By the articles of incorporation put in evidence by the plaintiff it was shown that the defendant was a corporation, organized under the laws of Utah, with a capital stock of $500,000 divided into 12,500 shares of the par value of $40 a share, to acquire, buy, sell, own, control, manage, regulate, and distribute waters of the Sevier river as well as other waters, and particularly the irrigation system upon the river known as the Gunnison Bend Reservoir and the Abraham Canal System, and to own, buy and sell, hold, lease, control, cultivate and improve, and otherwise deal in lands lying along and adjacent to the Sevier river and under the reservoir and canal system, and to own, buy, sell, and deal in mortgages, liens, securities, and other equities connected with or appertaining to such water rights, lands, and irrigation system.

It further was shown that at the time in question, and when the shares of stock were purchased by the plaintiff, the company had a full board of directors as by its articles of incorporation provided; that Ira D. Wines was its president, W. D. Livingston its secretary, and W. L. Livingston its treasurer; and that it maintained an office at Salt Lake City, where was its principal place of business, and where it kept its stock book and other corporate records, and, covering the period in question, Wines as president and W. D. Livingston as secretary issued, signed, and delivered all of the capital stock issued by the company; and that they, as such president and secretary, issued, signed, and delivered

two certificates to the plaintiff, the certificates in question, one for 80 shares and the other for 120 shares, which the plaintiff alleged and testified were purchased by him from the company for $35 a share.

Evidence also was given to show that no permit or license of any kind was had or given the company or to any of its officers to sell any of its capital stock or any other shares of stock or securities.

What chiefly divides the parties is the question of whether the two certificates, one for 80 shares and the other for 120 shares, issued by the company at the same time and signed by Wines as president and by W. D. Livingston as secretary of the company, and at the time of the sale to the plaintiff and in which certificates it was certified that the plaintiff was the owner of such shares, were purchased by the plaintiff from the company, as contended by him, or from W. D. Livingston individually as shares of stock owned by him and in and to which the company had no right, title, or interest at the time of the sale, as contended by the defendant.

In such particular the plaintiff gave evidence to show that one Cannon and one Christiansen were employed by the president and secretary of the company at its office at Salt Lake City, on a compensation agreed on, to sell shares, of its capital stock for and on its behalf, and that, in pursuance thereof, the shares of stock were sold to the plaintiff by Cannon and Christiansen. Cannon, a witness for and on behalf of plaintiff, and who chiefly made the sale to the plaintiff, in substance testified that the shares of stock consisted of treasury stock of the company, and that he, by the president and secretary of the company, was authorized and directed to sell such shares of stock of the company up to 500 shares. The witness on cross-examination specifically was asked if the shares of stock were not the shares of W. D. Livingston. The witness answered that, "They were not, that they were treasury stock of the company." Cannon further, in substance, testified that, before he entered the employ of the company through its president and

its secretary, he had several conversations with them relating to the business of the Abraham Irrigation Company at its office at Salt Lake City; that they told him the company had a lot of water stock that the farmers were utilizing without paying assessments; that the country was waterlogged, and by getting more settlers water could be spread out on new ground, which would help the country to build up; that they were anxious to do that, and "wanted me to go to work for them. He (Livingston) asked me to go to work for the company and I asked him what kind of a proposition he wanted to make me and Wines asked me if I thought I could get some settlers to go in there * * * I asked him what mode of campaign he would like me to put on and he told me he would like me with Christiansen to go through southern Utah, make appointments with representative farmers, meet with the different clubs and talk up Delta, and I asked him how I was to be paid. He says, 'We will advance you some expense money and we will take care of you on letting you have land that we have and you can make a nice piece of money out of your work.'" He further testified that Livingston stated the Abraham Irrigation Company had a great deal of water and stock, and "he told me to go down south and sell some of the treasury stock; he told me to sell 500 shares, I had named some men that I thought I could get interested in it. He stated it was treasury stock of the Abraham Irrigation Company. I made several trips south before I came back with any real money." The witness further testified that, in pursuance thereof, he had interested the plaintiff in the enterprise, and told him what Wines and Livingston had told the witness, that the stock was treasury stock, and that he could sell him some of such stock at $35 a share; that he took the plaintiff over the irrigation projects of the defendant, and on one occasion W. D. Livingston went with them and others, and showed them the lands which were "owned by the Abraham Irrigation Company"; that they looked over different parts of the valley, and, as they went along, Livingston pointed

out different tracts of land which were owned by the company. Thereafter the witness and the plaintiff returned to Mt. Pleasant, where the plaintiff resided, and had further negotiations concerning the purchase of the shares of stock; that the plaintiff told him he did not have sufficient moneys to pay cash for 200 shares, amounting to $7,000, and asked the witness to get the best terms he could for the payment of the purchase price. Thereafter, as testified to by the witness, he reported the matter to Livingston, and asked him whether it could be arranged that notes be given for some of the purchase price; and that Livingston told him that "he would have to take it up with the directors," and later told the witness that "he had it all fixed up so as to get the notes and that the board of directors had authorized him to sell the stock and obtain the notes together with as much cash as I could get." Thereupon the witness returned to Mt. Pleasant and completed the sale of 200 shares of the stock to the plaintiff at $35 a share, the plaintiff giving $2,000 in cash, Liberty Bonds, and coupons, and executed a note in the sum of $5,000, payable to "the Abraham Irrigation Company." The witness thereupon gave the plaintiff a contract of sale and delivered the cash, the bonds, and the $5,000 note to Wines and Livingston, the president and secretary of the company; that Wines asked the witness, "Is Hansen good for this note?" The witness explained to him the business the plaintiff was in, that he was a director in a bank at Mt. Pleasant, owned a lumber yard, ran a butcher shop, and otherwise explained the plaintiff's financial ability, whereupon Wines replied, "That looks like a pretty energetic man." The witness told Wines Hansen had a lot of influence and could get a lot of settlers for Delta. Thereupon Livingston stated: "I think we can give Mr. Hansen a little better deal. I am going to have two certificates made out, one for 120 shares and for 80 shares, so that he can utilize the 80 shares in proportioning the payment of $7,000," and thus gave the plaintiff a cash credit for 80 shares and the note for 120 shares, but, in lieu of the

note for $5,000 payable to "the Abraham Irrigation Company," the secretary drew up two notes, one for $2,000 and one for $3,000, payable to W. D. Livingston personally, and asked the witness to get the plaintiff to sign such notes in lieu of the $5,000 note, stating at the time "that the company would keep the notes and would not collect them until Mr. Hansen had utilized the 80 shares in putting it on the ground." Thereupon Livingston took from the stock book of the company two certificates, one for 80 shares and one for 120 shares, which were signed by Wines as president of the company and W. D. Livingston as secretary of the company, and directed the witness to deliver the certificates to the plaintiff "and get back from Mr. Hansen the contract I had written for the 200 shares of Abraham stock for the note he had given me." The witness asked Livingston why he desired the original note for $5,000 made in two notes, one for $2,000, the other for $3,000, and he stated, "Well, he said that he was acting there, he was the manager, and he wanted them made that way; I didn't question it; he said he wanted them that way; that he would protect Mr. Hansen better than he could through the company, that he would not force any collection until these 80 shares were utilized, that was his reason for wanting them that way." The witness further testified that he thereupon took the two certificates of shares, the two notes, and the note for $5,000 back to the plaintiff, told him what Livingston had stated, and asked the plaintiff to sign the two notes in lieu of the $5,000 note, which the plaintiff did, whereupon the $5,000 note was returned to him, the contract of sale surrendered, and the certificates delivered to him. He at the request of the witness indorsed in blank the certificate for 120 shares which was handed back to the witness to be held by the company as collateral security for the payment of the two notes. The witness took them back and the indorsed certificate and delivered them to Wines and Livingston at the office of the company at Salt Lake City.

Livingston thereafter indorsed the notes to Wines, who without indorsement negotiated them to a bank in Lehi, Utah county, together with the 120 shares of capital stock as collateral security. Just when that was done is not made to appear, except that it was before the maturity of the notes (October 12, 1921). Thereafter the bank demanded payment from the plaintiff. He thereupon sought Livingston and complained of the negotiation of the notes, stating they were negotiated in violation of the agreement not to negotiate them, whereupon Livingston stated he would make arrangements with the bank and would see "that the matter was taken care of," and the plaintiff given time to make arrangements to pay them. The bank became insolvent, and was taken over by the state bank commissioner, who, on the theory that the bank was a due course purchaser before maturity and for value and without notice of any infirmity of the notes, brought an action against the plaintiff and Livingston to recover the principal and interest of the $3,000 note, together with attorney's fees and costs. A judgment was had in that cause for the full amount, which was paid by the plaintiff. He also paid to the bank commissioner the whole of the $2,000 note together with interest. Assessments were levied on the shares of stock by the company. The assessments not having been paid, the company declared the shares of stock forfeited. The plaintiff thus lost not only the full purchase price paid by him but the shares of stock as well.

It is the contention of the defendant that, inasmuch as the two notes were made payable to Livingston, a conclusive presumption arose that the shares of stock purchased by the plaintiff were shares of stock owned and possessed by Livingston, and in and to which the company had no right, title, or interest, which, as further contended by the defendant, was corroborated by a resolution put in evidence of the board of directors of the company, dated in February, 1920 (the sale of the shares of stock to the plaintiff having been made in August, 1920), whereby it was resolved that

the Abraham Irrigation Company assumed to purchase all of the water rights of the Midland Company together with its distributive system, in consideration of which the defendant was to issue and transfer 3,000 shares of its capital stock to the Midland Company and assume all of the outstanding indebtedness of the Midland Company, including $20,000 owing to W. D. Livingston; and, inasmuch as the vice president of the company "had called attention to the fact that the Abraham Irrigation Company was the owner of and entitled to use a considerable amount of water in addition to the shares of stock now outstanding and that it would be proper and advisable to arrange for the sale and issue of additional stock in order to preserve the title and right to the use of all its water and to that end suggested that arrangements could be made to sell an additional amount of stock to or through W. D. Livingston," it, at the same time and at the same meeting, was further "resolved that the Abraham Irrigation Company shall and it does hereby sell to W. D. Livingston in accordance with his proposal to purchase a total of 3,730 shares of capital stock of the said Abraham Irrigation Company at $25 per share, or for a total purchase price of $93,250"; that the stock was to be executed in such denominations and to such persons as Livingston should designate or as might be agreed between him and officials of the company, and that the stock should be deposited in escrow with the trustee named in the trust deed securing the bond issue of the company; that, as security for the payment of the purchase price, Livingston was to deposit with the escrow holder notes and mortgages for $20,000 executed by the Midland Company in his favor, and upon the delivery of such notes and mortgages Livingston was entitled to receive 300 shares of stock and thereafter entitled to the delivery of one share of stock for every $25 of purchase price paid by him; that the cash payments, however, for the year 1920, were to aggregate an amount sufficient to meet the installments of principal and interest maturing upon the bond issue of the

company and to meet its current expenses for the year 1920; that all purchasers of the stock and who were to become owners and holders thereof were required to assume and pay their proportionate amount of the interest on the company's bonds after April 15, 1920; and that, whenever the amounts paid in, whether partly in cash or partly by note, together with the $20,000 worth of notes deposited by Livingston, aggregated the full amount of the purchase price and all of the stock fully paid for, it was to be delivered and surrendered to Livingston. The resolutions were signed by the directors of the company and by Livingston as secretary and as a director, but were not signed by the president of the company.

What, if anything, was done in pursuance of such resolutions was not made to appear. Had it been shown without substantial dispute that the material terms and conditions of the resolutions had been carried out and the shares of stock or a portion thereof mentioned therein issued and delivered by the company to Livingston in accordance with the resolutions, that all right, title, and interest in and to such shares of stock had vested in him, and that the shares of stock sold to the plaintiff constituted a portion of such shares and in which the company no longer had any right, title, or interest, then the nonsuit would have been properly granted, unless the company by its declarations or conduct estopped itself from asserting that the shares of stock sold the plaintiff were not its shares, or in and to which it had any right, title, or interest. But no evidence was given as to that, other than the resolution itself put in evidence, without proof of performance or part performance of any of its conditions or terms by either party. In other words, had it been made to appear without substantial dispute that the shares of stock sold the plaintiff were shares which the company had theretofore sold to Livingston and agreed to be transferred to him or to whom he might designate, and that the persons who sold the shares to the plaintiff were not employed by nor agents of the

company nor authorized by it to sell shares of stock for or on its behalf, but were employed by and were agents of Livingston individually to sell shares of stock of his own acquired or to be acquired by him from the company, then let it be assumed that the nonsuit would properly have been granted. But, as hereinbefore referred to, there was evidence to show that Cannon and Christiansen were directly employed by the company on an agreed compensation to sell shares of stock for and on its behalf, that the shares so sold to the plaintiff were for and on behalf of the company, and not for or on behalf of Livingston individually, and that the company paid, or at least partly paid, them for such service. Such evidence we think was sufficient to make out a prima facie case for the plaintiff, though it be considered in conflict with the terms of the resolution or the reasonable inferences to be deduced therefrom. The fact that the two notes, one for $2,000 and the other for $3,000, were made payable to Livingston individually in lieu of the $5,000 note payable to the defendant, after the sale had substantially been completed and the purchase price paid by the plaintiff, does not in and of itself conclusively show that the shares of stock purchased by the plaintiff were owned and possessed by Livingston and in and to which the company had no right, title, or interest. Equity will look, not to the mere form or shadow of a transaction, but to the substance of it and to the real transaction had between the parties.

We think the court improperly granted the nonsuit. The motion ought to have been overruled and the case heard and disposed of on the merits. The judgment of dismissal is therefore reversed, and the cause remanded, with directions to reinstate it and to grant a new trial; costs to appellant.

ELIAS HANSEN, FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.